UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

LUIS LOPEZ, as Administrator of the
Estate of Jaime Lopez-Cabrera,

                       Plaintiff,

             -against-

TROOPERS KEVIN WOLENSKY and
KATHERINE GOREY,

                  Defendants.

———————————————————————— x

No. 20-CV-7798 (CM)

### MEMORANDUM ORDER AND DECISION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

On September 25, 2018, New York State Police ("NYSP") Troopers Kevin Wolensky and

Katherine Gorey (together, the "Officers" or "Defendants") responded to multiple reports about a

man threatening a female with a knife at a restaurant in Stanfordville, New York. When they

arrived at the restaurant, the officers encountered Araceli Parra, who was sitting in her minivan,

and Jaime Roderigo Lopez-Cabrera – her husband – who was standing outside the vehicle.

The situation quickly deteriorated. Lopez-Cabrera placed his hand in a pocket that bulged

with what turned out to be the handle of an electric screwdriver. He refused to comply with Trooper

Wolensky's commands to show his hands and to stop moving forward toward the Trooper, saying

that he "did not want to." Although Trooper Wolensky, whose service weapon was drawn,

attempted to retreat, Lopez-Cabrera continued to close the distance between the two while grasping

1

the bulging object in his pocket. When he came within five to ten feet of Trooper Wolensky, the officer fired two rounds, fatally striking the Plaintiff's decedent.

A camera mounted outside the building captured much of the activity before, during, and after the fatal encounter. The court has been provided with the footage; it was viewed in chambers.

As a result of this tragic incident, Plaintiff Luis Lopez, as administrator of the Estate of Jaime Lopez-Cabrera, sued Trooper Wolensky and Trooper Gorey on September 22, 2020. (Dkt. No. 1) ("Compl."). The Officers have moved for summary judgment dismissing all claims against them.

The motion is granted.

## THE PARTIES' 56.1 SUBMISSIONS

Local Rule 56.1(a) requires parties who move for summary judgment motion to annex to their motion a short, concise statement, in numbered paragraphs, setting forth each fact in the case the movant contends is material and undisputed, together with citations to the evidence that proves that specific fact.

The moving Defendants have submitted such a Rule 56.1 statement. (Dkt. No. 38-1) ("SOF"). It lists 93 separate assertions of material fact. Each entry is supported by citation to record evidence, including video and audio exhibits, photographic evidence, documentary evidence, and affidavits. After reviewing every evidentiary citation in the Officers' Rule 56.1 SOF, it is clear that the cited evidence supports every one of the material facts asserted.[1]

This being so, the only way that the Plaintiff can raise a genuine issue of material fact is to direct the court to other evidence tending to show that the asserted fact is actually not true. To

---

[1] There are a few facts that are not supported by cited evidence, but those facts are not material. For example, there is no evidence to support the precise time when Parra arrived at the restaurant, but that fact is not material to the resolution of this case. Every MATERIAL fact is supported by the cited evidence.

accomplish this, Local Rule 56.1(b) requires Plaintiff to serve, with his opposition papers, "a correspondingly numbered paragraph responding to each numbered paragraph in [the 56.1] statement of the moving party[.]" Additionally, a 56.1(b) response should only "respon[d] to each paragraph [regarding] whether the facts are disputed and the basis for the dispute." *Estevez v Berkeley Coll.*, 18-CV-10350 (CS), 2021 WL 3115452, at \*11 (SDNY 2021), *aff'd*, 21-1988, 2022 WL 16843460 (2d Cir 2022) (internal citations omitted). And each responsive assertion must be supported with a citation to evidence that tends to prove the truth of that statement.

Plaintiff has submitted a Rule 56.1 response. (Dkt. No. 46-1) ("Pl. Resp."). The statement contains a response to each of Defendants' 93 separate assertions of material fact. However, none of these responses manages to raise a single genuine issue of material fact.

First, Plaintiff lodges a general objection to Defendants' 56.1 statement, alleging that it does not comply with Local Rule 56.1(a), because it is not a "short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried." Pl. Resp. at 1. I overrule this objection, which is manifestly ridiculous. Defendants' SOF may be 34 pages long, but it contains 93 separate short and concise statements of fact, and consists only of assertions of undisputed material facts supported by citations to the record.

Plaintiff next claims to raise a genuine issue of material fact as to some of the 93 SOFs in the Rule 56.1 Statement. He fails to do so.

Plaintiff argues that a number of Defendants' statements of fact are not in fact supported by the cited evidence. *See., e.g.*, Pl. Resp. at ¶¶ 1, 2, 3, 10, 11, 14, 18, 19, 37, 57, 62. However, every one of these challenged facts is supported by the cited evidence. Indeed, they are either repeated verbatim in the supporting evidence, are shown in security camera footage, can be heard in audio recordings, or can be inferred directly from the evidence cited in support. Plaintiff

contends that the video or audio evidence cited by the movants "speaks for itself," *see* Pl. Resp. at ¶¶ 10, 11, 14, 15, 18, 19, 86, 89, but that does not raise a genuine issue of fact. And to the extent that Plaintiff may be suggesting that the supporting audio or video evidence controverts the asserted factual statement (*Id.* at ¶¶ 14, 15, 18, 19, 89), he is incorrect; the challenged Rule 56.1 SOFs accurately describe what is seen and heard in the supporting audio and visual evidence.

Having failed to identify any SOF that is not supported by the cited evidence, Plaintiff points to other evidence – evidence not cited by the movants – that he deems relevant. But that additional evidence neither controverts the asserted fact nor contradicts the evidence cited by movants in support thereof. *See* Pl. Resp. at. ¶¶ 4, 13, 36, 39, 40, 42, 47, 52, 53, 59, 61-64, 67, 71-73, 77-78, 80, 82-85, 87-88.

Plaintiff next objects to the inclusion of certain factual statements on the basis that some facts contained in supporting affidavit evidence were not mentioned in any witness' prior deposition testimony. Pl. Resp. at ¶¶ 40, 57, 58, 63. But there is no rule that witness' testimony, whether in support of a motion for summary judgment or at trial, is limited to matters and details that were testified to in a pre-trial deposition. It is true that a witness cannot use an affidavit in support of a motion for summary judgment to change testimony given at a deposition. *See Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). But nothing prevents a witness from adding additional information that was not elicited by the questioner at the deposition and that does not contradict anything said at the deposition. For example, Trooper Gorey testified in her deposition that Trooper Wolensky issued verbal commands to Lopez-Cabrera while Wolensky had his gun drawn. *See* Gorey Tr. at pp. 178-79. Gorey repeated this testimony in her affidavit. She also swore to the additional fact that Trooper Wolensky's commands became louder and more emphatic as he

repeated them. Gorey Aff. at ¶ 34. Plaintiff argues that the addition of this information creates a genuine issue of fact because of some inconsistency between the deposition testimony and the affidavit. Pl. Resp. at ¶ 63. It does not. There is no disagreement between her deposition testimony and the affidavit; the latter simply contains a detail that Plaintiff's lawyer failed to elicit with his questioning, and that Trooper Gorey was not required to volunteer. Her lawyer was not required to elicit details that Plaintiff's lawyer may have failed to ask about; he did not need to ask his client any questions at all.

Plaintiff also objects to Defendants' Rule 56.1 statement on the ground that it "refers to facts not contained or considered in Defendants' memorandum of law; and thus . . . impermissibly attempts to enlarge Defendant's page limits for its arguments in violation of [this court's] Individual Rule V(D)." Pl. Resp. at 1. But there is no requirement that every statement in the Rule 56.1 SOF be discussed in a memorandum of law.

Finally, Plaintiff has filed his own 56.1 counter-statement of material facts, which includes 14 separate assertions of undisputed material facts. The Officers argue that this counter-statement should be disregarded as "Local Rule 56.1 does not . . . provide for 'a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment simply thinks are important.'" *Allen v Koenigsmann*, 23-CV5651 (LAP), 2024 WL 403113, at *3 (S.D.N.Y. Feb. 2, 2024). The Officers are correct that, "Rule 56.1(b) is for additional material facts Plaintiffs believe to be in dispute, not argument or other facts Plaintiffs find helpful." *Estevez*, 2021 WL 3115452, at *10; *see also Berrie v Bd. of Educ. of Port Chester-Rye Union Free School Dist.*, 750 F. App'x 41, 50 (2d Cir 2018). However, I have considered these 14 asserted facts and I conclude that none of them raises a genuine issue of fact that would preclude summary judgment in Defendants' favor.

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). In this case, the process of determining whether any genuine issue of material fact exist has been anything but streamlined. However, nothing Plaintiff has thrown at the wall sticks; he fails to raise any genuine issue of material fact that disputes any of the SOFs asserted in the moving Defendants' Rule 56.1 Statement. All of the material facts contained in the Officers' 56.1 Statement are thus deemed admitted.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Parra's Arrival at the Coyote Flaco

Prior to his death, Jaime Lopez-Cabrera – together with his wife, Araceli Parra – owned and operated a restaurant called the Coyote Flaco, which is located in Stanfordville, New York, in Dutchess County. SOF ¶¶ 1, 2.[2]

On September 24, 2018, Parra filed a petition seeking an order of protection from the Dutchess County Family Court against Lopez-Cabrera. *Id.* at ¶ 6; Ex. 17. In her application for a protective order, Parra stated:

> On September 21, 2018 at 11:30 A.M. at [the] Coyote Flaco Restaurant, 6063 Route 82, Stanfordville, NY: [my husband] did, while heavily under the influence of alcohol, begin yelling for [me] to not open the restaurant, ensuing an argument, then grabbing and slightly pulling on child, [redacted] shirt, causing [me] to intervene. Then [my husband] grabbed [me] by [my] right arm while yelling for [me] to go back to Mexico, then angrily breaking numerous items, including a computer, while refusing [my] repeated requests to stop, scaring [me] and [causing] other employees to leave and for [my husband's] brother to call police. Then NYS Troopers arrived, who had [my husband] transported via ambulance to Northern

---

[2] This case should have been heard by one of our excellent judges who sit in the Brieant Court House in White Plains, which takes all cases from Dutchess County. I am not sure why this case is on my docket but I will not burden my White Plains colleagues with it.

Dutchess Hospital, where he [was] hospitalized. [My husband] had been consuming drinking alcohol for four prior days, and had been hospitalized for the same from the last week of August, 2018 until September 6, 2018. [I] fear[] [my husband's] alcohol consumption and anger escalate physical toward [me] and in front of the children.

Ex. 17. The judge granted the application and entered the protective order the same day.

The next morning (September 25, 2018), Parra drove to the Coyote Flaco to open the restaurant. SOF ¶ 1. When she went into the restaurant's back office, *Id.* at ¶ 3, she found her husband asleep on a couch. There was a partially empty bottle of tequila next to him. *Id.* Lopez-Cabrera awoke; Parra observed that he appeared to be intoxicated. *Id.* at ¶ 7; Parra Tr. at 487. She also noticed several knives sitting on top of a fax machine; she believed Lopez-Cabrera had brought the knives to the office. SOF at ¶¶ 4, 5, 7.

Parra stepped out of the office and called her brother-in-law, Jinhson Lopez. Parra told Lopez that his brother Jaime was at the Coyote Flaco, had knives, and was drunk. *Id.* at ¶ 8. Lopez told Parra to go home; he said he would call the police. *Id.* at ¶ 9; Parra Tr. at 489.

**The 911 Calls**

Lopez hung up with Parra and called 911. Because he was driving through Brooklyn at the time, Lopez was connected to New York City 911. He told NYC-911 that: "My brother has a knife and he's threatening my sister-in law in uh … Stanfordville, New York." SOF at ¶ 10; Ex. 13. The dispatcher, clearly unfamiliar with Dutchess County or Stanfordville, struggled to understand exactly where this was happening; she had difficulty spelling the road, town, and county. A frustrated Lopez finally hung up. Ex. 13.

Lopez next called NYSP Troop K, the troop that covers Dutchess County and Stanfordville. He reported the following: (1) "my brother he has a knife in the restaurant he's threatening my sister-in-law inside the restaurant;" (2) "my brother's in the restaurant. He's drunk. He has a knife.

My sister-in-law is there. She has a restriction order against him;" and (3) "He has a knife… My sister-in-law called me to call you. Can you go check please?" SOF at ¶ 11; Exs. 14 and 15. Lopez provided NYSP Troop K with the name of the restaurant and its address, 6063 Route 82, Stanfordville, NY, 12581. *Id.*; SOF at ¶ 12.

**Parra Attempts to Leave the Coyote Flaco**

After to speaking to Lopez, Parra returned to the office where her husband was. She told him that the police were being called. SOF at ¶ 13. Lopez-Cabrera asked Parra not to leave so she could "see how [the police] take me away." *Id.*; Parra Tr. at 497-98. Parra walked out the back door of Coyote Flaco. SOF at ¶ 14.

Most of the ensuing events were captured on the Coyote Flaco's outdoor security camera, which was located at the rear of the restaurant. Exs. 1, 2. The camera footage shows that it was raining outside when Parra left the restaurant and continued to rain throughout the relevant events. SOF at ¶ 50; Ex. 2.

After leaving the restaurant, Parra collected the couple's son, who had been waiting outside. SOF at ¶ 14; Ex. 2. Mother and son got into Parra's silver minivan, which was parked a few feet away from the rear door of the restaurant, next to a red Mustang. SOF at ¶ 14; Ex. 2. Lopez-Cabrera followed Parra outside. Ex. 2.

Parra had to back the minivan up in order to leave the parking area. SOF at ¶ 16; Ex. 2. But Lopez-Cabrera blocked the minivan's exit route – first by standing behind the vehicle, SOF at ¶¶ 15, 18; Ex. 2, and then by placing objects in back of the van, including trash cans, a propane tank, and a large toy car. SOF at ¶ 18; Ex. 2. Unable to move, Parra called a friend to come and pick up the couple's son. Parra Tr. at 515; SOF at ¶ 17; Ex. 2.

**The New York State Police Are Dispatched**

NYSP dispatched New York State Trooper Katherine Gorey to respond to "6063 Route 82, Coyote Flaco" for "Jaime Lopez, threatening a female with a knife." SOF at ¶ 20. Dutchess County 911—which received a call from NYC-911 – also asked for assistance at the Coyote Flaco. *Id.* Trooper Gorey asked, "Is this call in regards to somebody threatening somebody else with a knife?" *Id.* at ¶ 22. Dutchess County 911 confirmed that was correct. *Id.* Trooper Gorey stated that she had already been dispatched to that call and reported the address as "6063 Route 82." Dutchess County 911 confirmed this was the correct address, adding, "We received a call from New York City 911 stated that a male called, advised that his brother has a knife at that location is threatening people and then hung up. Unknown further." *Id.* at ¶¶ 23, 24.

Because of the nature of the call, Trooper Gorey asked that a second unit be sent to the Coyote Flaco. *Id.* at ¶ 25. NYSP Trooper Kevin Wolensky confirmed via radio that he was heading to the restaurant and would assist. *Id.* at ¶ 26.

**Trooper Gorey Arrives at the Scene**

Trooper Gorey arrived at the Coyote Flaco at approximately 11:12 a.m. *Id.* at ¶¶ 27, 28. She pulled up to the front of the restaurant, parked adjacent to the road, and exited her police vehicle. *Id.* at ¶ 29. Because Mr. Parra's minivan was parked behind the restaurant, Trooper Gorey could not immediately see Lopez-Cabrera or Parra.

Initially, Trooper Gorey tried to enter the restaurant through the front doors. *Id.* at ¶ 29. Finding the doors locked, she made her way to the rear of the premises, *Id.* at ¶ 31, where she observed a man (Lopez-Cabrera) standing at the driver's side door of a silver minivan, speaking to a woman (Parra), who was sitting in driver's seat. *Id.* at ¶¶ 32, 34, 35. Trooper Gorey observed that a propane tank, children's toys, and garbage cans blocked the rear of the minivan; she

9

recognized that the objects had been placed in a manner that effectively trapped the minivan in place. *Id.* at ¶ 33.

As Trooper Gorey approached the driver's side of the minivan, Parra tried to get out of her car. Trooper Gorey instructed her to close the door and wait inside the vehicle. *Id* at ¶ 36; Ex. 1. Parra complied with this request. SOF at ¶ 36.

Trooper Gorey then walked around to the passenger side of the minivan. Through the window, Parra handed Trooper Gorey the order of protection against her husband. Parra pointed to Lopez-Cabrera, who was still standing on the driver's side of the van. Trooper Gorey understood that the man standing beside the minivan was not allowed to be there. SOF at ¶¶ 37, 38.

After Parra handed over the order of protection, her husband started walking around the front of the minivan towards Trooper Gorey. *Id.* at ¶¶ 37, 38; Ex. 1. Gorey motioned for him to stop moving. He complied, stopping a few feet in front of her. SOF at ¶40. Trooper Gorey then instructed Mr. Lopez-Cabrera to show his hands; he raised them in the air. *Id.* Gorey did not see any weapons in Lopez-Cabrera's hands. Gorey Tr. at 148.

After a few seconds, Lopez-Cabrera lowered his hands to his sides. SOF at ¶ 40. Trooper Gorey asked him if he had any weapons. *Id.* at ¶ 41. Lopez-Cabrera tapped his left pant pocket with his left hand, smiled, nodded affirmatively, and said the word "weapon." *Id* at ¶ 42. He then put his left hand into his left pants pocket. *Id* at ¶ 43.

### *Trooper Wolensky* **Arrives at the Scene:**

Approximately seven seconds later, Trooper Wolensky – like Gorey, in uniform – arrived at the rear of Coyote Flaco. *Id.* at ¶¶ 43, 45. He observed Gorey standing near the passenger side door of a silver minivan. *Id.* at ¶ 49. Wolensky also saw that there were objects scattered around the rear of the minivan. *Id.* at ¶ 50.

Trooper Wolensky began to move towards the red Mustang that was parked next to Parra's minivan. Gorey called out to Wolensky that the man had a weapon. *Id.* at ¶¶ 51, 52. Trooper Gorey then moved to the rear of the minivan, to remove the objects that were blocking the vehicle from leaving. *Id.* at ¶55.

Trooper Wolensky rounded the red Mustang; he stopped at the front of the vehicle of the red Mustang where he found himself face to face with Lopez-Cabrera. *Id.* at ¶54. Lopez-Cabrera in turn started backing up towards the rear doors of Coyote Flaco. Ex. 1. Wolensky observed that Lopez-Cabrera's left hand was in his left pants pocket; he seemed to be gripping some sort of large, handled object. *Id.* at ¶57. Wolensky commanded, "Show me your hands" and told Lopez-Cabrera to "Take your hands out of your pockets." *Id.* at ¶ 59. Lopez-Cabrera refused to comply; he kept his left hand in his left pants pocket. *Id.*

Lopez-Cabrera then began walking toward Trooper Gorey at the rear of the minivan. *Id.* at ¶ 61. Trooper Wolensky – now with his service weapon drawn – moved towards the front of the minivan, maintaining Lopez-Cabrera in his line of sight. *Id.* at ¶59. Wolensky repeated his command that Lopez-Cabrera show his hands; with each repetition his tone of voice became louder and more emphatic. *Id.* at ¶63.

Gorey motioned for Lopez-Cabrera to stop moving toward her, which he did. SOF at ¶61; Ex. 1. He then turned to face Trooper Wolensky. Lopez-Cabrera had an unobstructed view of Wolensky, so he could see that the trooper's gun was drawn and pointed at him. SOF at ¶¶ 64, 66; Ex. 1. Trooper Wolensky continued to demand that Lopez-Cabrera show his hands; Plaintiff's decedent refused and instead dug his left hand down deeper into his left pants pocket. SOF at ¶ 67. Finally, when Wolensky again commanded that Lopez-Cabrera "Show me your hands," he replied, "No, I don't want to," "smirked," and started moving toward Wolensky. *Id.* at ¶¶ 69, 74. The video

11

reveals that Lopez-Cabrera moved toward Wolensky at a speed slightly faster than a normal walking pace, but not running. Ex. 1 at 12:48-12:55.[3]

With his service weapon still pointed at Lopez-Cabrera, Wolensky began retreating. He took three steps backwards – dodging a red dolly cart and a plastic box – and then eight additional steps backwards over slippery, rocky, and uneven terrain. SOF at ¶ 76. While backing away, Trooper Wolensky continued to demand that Lopez-Cabrera show his hands and stop moving forward. *Id.* at ¶ 79. Lopez-Cabrera did exactly the opposite; he continued moving directly towards Wolensky, closing the distance between them, while keeping his hand in his pocket. *Id.* at ¶¶ 77, 80, 83.

When Lopez-Cabrera got to within 5 to 10 feet of Trooper Wolensky, Wolensky fired two shots from his service weapon, both of which struck Lopez-Cabrera, who fell to the ground. *Id.* at ¶¶ 84, 89. Wolensky then placed Lopez-Cabrera in handcuffs and reached into his left pants pocket, where he found a thick plastic handle that the parties agree belonged to an electric screwdriver. *Id.* at ¶¶ 89, 90.

Troopers Wolensky and Gorey applied first aid to Lopez-Cabrera until an ambulance arrived at the scene and transported him to Mid-Hudson Regional Hospital, where he was pronounced dead shortly after arrival. *Id.* at ¶¶ 91-93.

## PROCEDURAL HISTORY

On September 22, 2020 – two years after the fatal shooting – Luis Lopez, in his capacity as administrator of the estate of Jaime Lopez-Cabrera, filed the complaint in this action. Lopez also filed an action in the New York Court of Claims against the State of New York arising out of

---

[3]The parties respective Rule 56.1 statements characterize Lopez-Cabrera's speed differently – Plaintiff says that the decedent did not make any type of "explosive" movement towards Wolensky and Defendants say that the decedent moved "swiftly" – there is no disputed issue of fact, because the video recording clearly establishes that Plaintiff's description is correct.

the same incident.

The parties did not diligently prosecute the case, despite repeated orders from the court directing them to move the case along. (*See, e.g.*, Dkt. Nos. 21, 24, 26). The final discovery deadline was December 31, 2023. (Dkt No. 26). Defendants filed the present motion for summary judgment on March 30, 2024 (Dkt. No. 38) ("Mot."), together with a motion to preclude expert testimony, which they obviously anticipated, (Dkt. No. 40), both of which Plaintiff has opposed. (Dkt. No. 46) ("Opp."); (Dkt. No. 48).

I can dispense quickly with Defendants' motion to preclude reliance by Plaintiff on expert testimony. Defendants argue that Plaintiff's expert testimony is inadmissible. Defendants are correct. In a report submitted in satisfaction of Fed. R. Civ. P. 26, the plaintiff's designated expert – retired New Jersey State Trooper Mickie McComb – (1) testified to lesser or alternative uses of force that Defendants could have employed; and (2) suggested that Defendants, not Plaintiff's decedent, either created a need for force, or exacerbated, escalated, or provoked the situation. Both opinions are irrelevant in excessive force cases and so would be inadmissible if offered into evidence. *See, e.g., Bermudez v. City of New York*, No. 15-CV-3240 (KAM)(RLM), 2019 WL 136633, at *9 (E.D.N.Y. 2019); *Estate of Jaquez v. Flores*, No. 10 Civ. 2881 (KBF), 2016 WL 1060841, at *5 (S.D.N.Y. 2016); *Bancroft v. City of Mt. Vernon*, 672 F. Supp. 2d 391, 406 (S.D.N.Y. 2009); *Fortunati v. Campagne*, 681 F. Supp. 2d 528, 536 (D. Vt. 2009), *aff'd sub nom. Fortunati v. Vermont*, 503 F. App'x 78 (2d Cir. 2012).

However, Plaintiff does not offer the Trooper McComb's expert testimony in opposition to Defendants' motion for summary judgment. While Plaintiff opposes summary judgment on the ground that there are genuine issues of material fact going to a determination of the "reasonableness" of Wolensky's use of deadly force, and that Trooper Wolensky actions were

"outside the bounds of the law," (Opp. at 16-26), his brief in opposition to Defendants' motion makes no mention of Trooper McComb or his expert report. For that reason, the motion to preclude expert testimony appears to be superfluous. It is denied, both on the merits and as moot.

And so I turn to the motion for summary judgment.

### Plaintiff's Claims

The complaint – which was drafted by an attorney, not by a Plaintiff Pro Se – alleges four causes of action. Count One is for "conscious pain and suffering resulting from civil rights violations, brought against against [sic] all defendants under 28 U.S.C. §1983." (Compl. at 4). Count Two is for "wrongful death (pecuniary loss & loss of parental guidance) resulting from civil rights violations, brought against against [sic] all defendants under 28 U.S.C. §1983." (*Id.* at 6). Count Three is for "conscious pain and suffering resulting from battery, brought against all defendants" under New York state law. (*Id.* at 9). And Count Four charges "wrongful death (pecuniary loss & loss of perental guidence [sic]) resulting from battery" under New York state law. (*Id.* at 10).

Plaintiff's third and fourth causes of action are dismissed. The Officers argue, and Plaintiff does not dispute, that these claims, which sound in battery, are untimely. (Dkt. Nos. 38 at 9; 46 at 26). A claim for battery under New York law is governed by a one-year statute of limitations. New York Civil Practice Law and Rules § 215(3); *see also Powell v Scollard*, 21-CV-1477 (VSB), 2023 WL 5975249, at *3 (S.D.N.Y 2023). The fatal shooting occurred on September 25, 2018, and the complaint was not filed until almost two years later. Accordingly, Counts Three and Four are time barred and are dismissed with prejudice.

Plaintiff's first and second claims are for civil rights violations – indeed, they are a single claim, alleging that the same civil rights violation (excessive force/failure to intervene, see below)

resulted in Lopez Cabrera's wrongful death and conscious pain and suffering (which are types of damages, not causes of action). These federal claims are properly brought under *42* U.S.C §1983, not, as Plaintiff pleads, under *28* U.S.C. §1983. Moreover, although the court has been able to identify the nature of the civil rights violation(s) pleaded, Plaintiff does not specifically plead what they are. Although Plaintiff purports to assert these claims "under the Constitutions and laws of the United States of America and of the State of New York," nowhere does he specify on what statutes and amendments he relies. And because counsel is representing Plaintiff, the court is not required to bend over backward to try to make sure that the Plaintiff has stated a claim.

However, it is apparent that Plaintiff is asserting is that Wolensky used excessive force, including deadly force, in violation of Lopez Cabrera's rights under the Fourth Amendment to the United States Constitution. *Salim v. Proulx*, 93 F.3d 86, 88–89 (2d Cir. 1996) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). On the facts pleaded, the only claim against Gorey is that she failed to intervene to prevent Wolensky from using excessive force in violation of his constitutional right to be free from excessive force.[4] These are the only federal civil rights claims that could possibly be asserted on the facts pleaded. In his brief in opposition to the motion, Plaintiff acknowledges that his Section 1983 claim arises under the Fourth Amendment. (Opp. at 14-15).

## LEGAL STANDARD

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 247-48 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party

---

[4] Because the state law battery claims are time-barred, there can be no claim again Gorey with respect to them, either.

against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for the court to determine. *Balderman v. United States Veterans Admin.*, 870 F. 2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

## Excessive Force

The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest. *Graham*, 490 U.S. at 395. "Claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.*; *see also Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). "[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or

motivation." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002) (quoting *Graham*, 490 U.S. at 397); *see also Pelayo v. Port Auth.*, 893 F.Supp.2d 632, 641–42 (S.D.N.Y. 2012) ("A police officer's use of force is 'excessive' in violation of the Fourth Amendment if it is 'objectively unreasonable' in light of the facts and circumstances known to the officer." (citations omitted)).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. "Accordingly, whether the force used in connection with the arrest is reasonable depends on a careful weighing of the totality of the circumstances in each particular case, including whether the suspect poses a threat, resists, or attempts to evade arrest, and the severity of the crime at issue." *Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 591–92 (S.D.N.Y. 2013).

"Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004). "[A]n officer's decision to use deadly force is objectively reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Cowan ex rel. Est. of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) (quoting *O'Bert v. Vargo*, 331 F.3d 29, 36 (2d Cir. 2003)). Therefore, "To survive summary judgment [in a deadly force case], the [plaintiff must] raise a material question of fact as to whether [the officer's] decision to use deadly force

was 'objectively reasonable,' or in other words, whether he had 'probable cause to believe that [the suspect] pose[d] a significant threat of death or serious physical injury to [himself] or others.'" *Costello v. Town of Warwick*, 273 F. App'x 118, 119 (2d Cir. 2008) (quoting *Cowan*, 352 F.3d at 762).

In this case, for reasons discussed below (pp. 23-29), no reasonable factfinder could conclude that Trooper Wolensky's conduct was objectively unreasonable. Therefore, this is the rare case in which summary judgment is appropriately granted on the ground that Wolensky committed no constitutional violation – which in turn means that Gorey is entitled to summary judgment because there was no constitutional violation she could have prevented.

**Qualified Immunity**

In the alternative, the defendant troopers assert a defense of qualified immunity, which is a related but separate inquiry from that on the merits. The difference is that "the qualified immunity inquiry goes on to ask whether any constitutional violation was clearly established." *Jackson v. Tellado*, 236 F. Supp. 3d 636, 661 (E.D.N.Y. 2017). Thus, when the Officers argue that their conduct was "objectively reasonable," their contention is that there was no constitutional violation. *Cowan*, 352 F.3d at 762. When they argue instead that they are entitled to qualified immunity, the contention is that the Officer had a reasonable *belief* that their conduct was lawful. *Id.* (citing *Stephenson v. Doe*, 332 F.3d 68, 80 n. 15 (2d Cir. 2003) ("Qualified immunity is a difficult concept; it looks to the reasonableness of an officer's belief that he acted lawfully after the officer is found to have been unreasonable in his conduct.")).

"Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Foe v. Leonard*, 282 F.3d 123, 132 (2d Cir. 2002). This framework is

intended to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The entitlement is an *immunity from suit* rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Atwood v. Town of Ellington*, 468 F. Supp. 2d 340, 351 (D. Conn. 2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original)).

Accordingly, qualified immunity involves application of a two-part test: (1) whether there was a constitutional violation, and (2) whether the defendant acted unreasonably under settled law, i.e., whether the right was clearly established. *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019). "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kelsey v. County of Schoharie*, 567 F.3d 54, 60–61 (2d Cir. 2009) (quoting *Harlow*, 457 U.S. at 818).

"Disputes over reasonableness are usually fact questions for juries. However, in qualified immunity cases, we are not concerned with the correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene. With this concern in mind, we have held that when the factual record is not in serious dispute ... [,][t]he ultimate legal determination whether ... a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide." *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (citing *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990), *cert. denied*, 498 U.S. 967, 1 (1990); *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994), *cert. denied*, 513 U.S. 1076 (1995); *Finnegan v. Fountain*, 915 F.2d 817, 821 (2d Cir. 1990).

Here the factual record is not in serious dispute – indeed, it is not in dispute at all. While I conclude that no constitutional violation occurred, both officers are entitled to qualified immunity if one did occur.

## DISCUSSION

### A.  There Are No Material Facts in Dispute

Plaintiff argues that summary judgment is inappropriate because there are disputed facts which are material to the determination of reasonableness.

First, Plaintiff claims that there is a dispute of fact as to whether Lopez-Cabrera was "armed" at the time of the shooting. But the fact that Lopez-Cabrera did not have "a knife" on him when he was shot is of no relevance on this motion. The undisputed facts show that plaintiff's decedent (1) told Trooper Gorey that he had a had a weapon and pointed to his left pocket; and (2) actually had an electric screwdriver handle in his pocket, which he was holding in his concealed hand. The fact that Parra, Lopez, and the 911 dispatchers said that Lopez-Cabrera had a knife while he was threatening his wife is relevant only insofar as that report – the fact of which is undisputed – could be relied on by the officers as they assessed the situation they were facing. In particular, it is relevant when assessing whether it objectively appeared to a reasonable police officer – who had been told by 911 that a man was threatening a woman – that the man who said that he had a weapon in his pocket, and who was approaching them with his hand in his pocket, was armed with a knife. That is what is relevant on this motion – not whether the handle in his pocket was actually a knife.

Second, Plaintiff claims there is a factual dispute over Trooper Wolensky's belief that Lopez-Cabrera's movements were "aggressive." But there is no dispute about what is captured in

the video recording – Lopez-Cabrera, his hand in the pocket where he had indicated that he had a weapon, walked directly toward a police officer who told him repeatedly to stop and take his hand out of his pocket. Although Plaintiff claims that there is a "dispute," Plaintiff is constrained to admit that the security video is clear and shows "what really transpired." "As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an **objective one**: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (emphasis added). Trooper Wolensky's subjective belief that Lopez-Cabrera's movements were "aggressive" or that he felt "threatened" by Lopez-Cabrera would not be relevant to this objective inquiry. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *Betts v. Shearman*, No. 12 CIV. 3195 JPO, 2013 WL 311124, at *10 (S.D.N.Y. Jan. 24, 2013), *aff'd*, 751 F.3d 78 (2d Cir. 2014). Objectively, Lopez-Cabrera was acting in a manner that could reasonably be construed as creating a danger to the police officers.

Next, Plaintiff argues that there is a dispute of fact because it is "uncontroverted" that Trooper Wolensky never warned Lopez-Cabrera that he intended to use deadly force. There is no dispute of fact; the court agrees that Trooper Wolensky never did so. Unfortunately for Plaintiff, there is also no requirement that a police officer issue such a warning to a man who repeatedly refused either to cease moving toward the officer or to take his hand out of the pocket where he had indicated there was a weapon.

Plaintiff argues that the Second Circuit's decisions in *Thomas v. Roach*, 165 F3d 144 (2d Cir. 1999), and *Rasanen v. Doe*, 723 F.3d 325 (2d Cir. 2013) preclude summary judgment in favor of the officers. However, neither case is helpful for Plaintiff's argument.

In *Thomas*, the Second Circuit held that there was a genuine dispute of material fact because the parties offered conflicting evidence as to certain material facts surrounding an excessive force claim. *Id.* at 143. For example, the plaintiff averred that he did not have a knife and that he never attempted to harm the officer, whereas the officer stated that defendant was armed and had attempted to harm him. This conflict created a genuine issue of fact. *Id.* at 141. There is no such conflicting evidence here; the officers' stories are corroborated by the videotape.

*Rasanen* was an appeal from a district court's denial of a motion for a new trial in an excessive force case. *Id.* at 328. The Second Circuit ordered a new trial, but did so because the lower court had given an erroneous instruction on the legal standard for excessive force. *Id.* at 337-38. Nothing in the court's decision turned on the existence of disputed issues of fact, and Plaintiff does not argue otherwise. Instead, Plaintiff simply points out that the underlying facts of this case and *Rasanen* are similar. That does not create a dispute of fact in the instant case.

## B. No Reasonable Factfinder Could Conclude That Trooper Wolensky's Conduct Was Objectively Unreasonable

In determining whether the force used was reasonable, a court will consider "the facts and circumstances of each particular case, including the (1) severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Here, the reported crime at issue, a man threatening a woman with a knife, was serious. The reports indicated the possibility that the subject was armed with a knife or knives. While there was really only one report – from Lopez – the officers had no way of knowing that the same individual had called two different law enforcement agencies, so it appeared that there were multiple reports.

The factual accuracy of these 911 reports was consistently substantiated by Trooper Wolensky's observations at the scene. Although the suspect did not have a knife, the relevant

inquiry concerns the objective "facts and circumstances confronting" Trooper Wolensky at the time of the shooting. *Graham*, 490 U.S. at 396. Based on the facts available to the Trooper, a reasonable officer would have concluded (reasonably, but mistakenly) that Lopez-Cabrera was in possession of a knife. *See Bancroft*, 672 F. Supp. 2d at 406. Within seconds of Trooper Wolensky's arrival, Trooper Gorey told Trooper Wolensky that Lopez-Cabrera had a "weapon." Courts both within and outside of this Circuit have found the use of force to be reasonable where an officer relied on a fellow officer's warning that a suspect had a weapon – even if the first officer never actually saw the weapon. *See, e.g., Smith v. Sawyer,* 435 F. Supp. 3d 417, 436 (N.D.N.Y. 2020) (granting summary judgment on reasonableness when a fellow officer yelled that the suspect had a gun); *McLenagan v. Karnes*, 27 F.3d 1002, 1005, 1007–08 (4th Cir. 1994) (finding reasonable the split-second use of deadly force against an unarmed, handcuffed suspect where a fellow officer yelled, "[t]he man has got a gun!" and where the shooting officer "could not see" whether the suspect "had a gun in his hands"). "That is so even if the belief may have ultimately been mistaken." *Sawyer*, 435 F. Supp. at 436 (collecting cases); *see also Pub. Adm'r of Kings Cnty. v. United States*, No. 88 CIV. 0190 (BN), 1989 WL 116307, at *7 (S.D.N.Y. Sept. 26, 1989) ("[T]o be judged 'reasonable,' a peace officer is not required to be absolutely certain of his facts before taking defensive action. Rather, an officer's belief that another is armed with a deadly weapon, or is about to use deadly physical force, may be reasonable—and the use of deadly physical force justified—even if his belief turns out to be mistaken."); *Marrow v. Amato*, No. CIV. 3:07CV401PCD, 2009 WL 350601, at *6 (D. Conn. Feb. 12, 2009).

Moreover, while Lopez-Cabrera did not have a knife, he both told Trooper Gorey that he was in possession of a "weapon" (which Gorey in turn told Wolensky) and he kept his hand on an object that was admittedly in his pocket – a large object that turned out to be a tool handle.[5]

The fact that Lopez-Cabrera admittedly had something in his pocket and that he would not show his hands when ordered to is another indication of the reasonableness of Wolensky's belief that the situation presented a danger to his safety. *See Slattery v. Rizzo*, 939 F.2d 213, 215 (4th Cir. 1991) (use of deadly force affirmed as reasonable when the officer "could not see [suspect's] left hand clearly. . . . [but] was, however, able to see that the hand appeared to be partially closed around an object . . . . [which] was later determined to be a beer bottle."). What Wolensky could see – a man with his hand in his pocket grabbing a bulky object – matched what he had heard over his radio – that a man was threatening others with a knife. None of the facts known to the Trooper controverted this report.

Plaintiff claims that Trooper Wolensky – before firing his weapon – should have explicitly warned Lopez-Cabrera that he was willing to use deadly force. However, the fact that there were alternative choices available to Officer Wolensky prior to his use of force is not relevant to a "reasonableness" inquiry. That inquiry focuses on whether the officer "ha[d] probable cause to believe that the suspect pose[d] a significant threat of death or serious physical injury to the officer or others." *Vargo,* 331 F.3d at 36. "[T]he existence of an alternative approach does not render the one chosen by [an officer] to be objectively unreasonable." *Breitkopf v. Gentile*, 41 F. Supp. 3d 220, 246 (E.D.N.Y. 2014). "The question [of reasonableness] ultimately relates to whether a

---

[5] The term "weapon" or "dangerous instrument" is not limited to guns and knives; under New York law, the term is defined as "any instrument, article or substance . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury." Items such as a hammer, screwdriver and wrench have been found to be capable of being used as weapons. *See, e.g., People v. Holmes*, 9 A.D.3d 689, 691 (App. Div. 3d Dep't 2004); *People v. White*, 185 A.D.2d 460, 461 (App. Div. 3d Dep't 1992).

particular type of force (including method and application) was appropriate at the time of the incident. This determination ***does not include an evaluation of the choices***, or lack thereof, the officer has at his disposal at the relevant moment. Indeed, courts have consistently held that 'the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them.'" *Jaquez*, 2016 WL 1060841, at *5 (emphasis added) (citing *Bancroft*, 672 F. Supp. 2d at 406); *see also Illinois v. Lafayette*, 462 U.S. 640, 647 (1983); *United States v. Martinez–Fuerte*, 428 U.S. 543, 556–57 n. 12 (1976).

There were only a few seconds between the time when Lopez-Cabrera started walking toward Trooper Wolensky and when the fatal shots were fired. During that time, Trooper Wolensky – backing up, with his service weapon drawn and pointed –ordered Lopez-Cabrera both to stop moving and to show his hands. These commands were objectively reasonable given the situation. Trooper Wolensky wanted Lopez-Cabrera to stop moving towards him – a menacing action – and to take his hand out of his pocket, which is something any reasonable officer would demand when confronted with a suspect who was clutching an object reasonably suspected to be a weapon. The court need not ascertain whether some other commands (e.g., "Stop or I'll shoot") or some other action might have led to a different, non-fatal outcome. I cannot say that what Wolensky did when confronted with an uncooperative subject who would not stop advancing or show his hands was unreasonable.

Plaintiff argues that Parra believed that Trooper Wolensky had a taser, not a gun, and concludes that Lopez-Cabrera must have thought the same. What Parra thought has no relevance for our purposes; it is "*the officer's knowledge* of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Salim*, 93 F.3d at 92 (emphasis added); *see also Tracy*, 623 F.3d at 97. The issue is what Trooper Wolensky knew –

and what he knew was that an ostensibly armed person was walking toward him while holding an object in his pocket. Whether Parra – or Lopez-Cabrera – thought that the officer's gun was a taser would be of absolutely no moment, even if the victim's state of mind could be proved – which it cannot. But the point is that it need not be.

Plaintiff also claims that Trooper Gorey said she "never felt threatened" by Lopez-Cabrera prior to the shooting. In fact, the officer testified that she could not remember whether she felt threatened at that moment, Gorey Dep. at 180-181. But again, the issue is what did Wolensky know and what reasonable inferences he could draw from the objective facts that were known to him. What he knew was that an ostensibly armed person – someone who a fellow officer said possessed a weapon– was advancing toward him and refusing repeated commands to stop and show his hands.

Plaintiff claims that Lopez-Cabrera never took any "aggressive action" towards the Troopers. That is not true. Lopez-Cabrera consistently disobeyed Troopers Wolensky's orders to show his hands and to stop moving. Indeed, at one point explicitly he explicitly told Trooper Wolensky that he would not comply with the officer's orders. The reasonableness determination takes into account the actions of a suspect, not just the officer, and requires regard for "the actual fact that [Lopez-Cabrera] was continuing to move toward [Trooper Wolensky] even after being commanded to get back [while] having" what appeared to be a weapon. *See Shepherd on behalf of Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 284 (5th Cir. 2019) (affirming summary judgment on "reasonableness" based in part on similar facts). As Lopez-Cabrera approached the Trooper, he dug his hand deeper into his pocket to get a better grip on the object therein, which Trooper Wolensky reasonably but incorrectly thought to be a knife. *See Davidson v. City of Opelika*, 675 F. App'x 955, 959 (11th Cir. 2017) (per curiam) (affirming summary judgment,

observing that "the unusual position of the dark object in [the plaintiff]'s outstretched and clasped hands would have led a reasonable officer to believe that [the plaintiff] was pointing a gun at him"). Viewing these objective and undisputed facts through the eyes of a reasonable officer on the scene, it is perfectly obvious that Lopez-Cabrera's actions would appear to be aggressive. No reasonable fact finder could conclude differently.

Finally, Trooper Wolensky did not – as Plaintiff suggests – have to wait for Lopez-Cabrera to "lunge" at one of the Officers, to withdraw a knife from his pocket, or to threaten one of the officers explicitly before employing deadly force. *See Phillips v. James*, 422 F.3d 1075, 1084 (10th Cir. 2005) ("There [i]s no reason for [an officer] to have to wait to be [harmed] or even to see [an individual begin to use a weapon] before it would be reasonable for" the officer to employ deadly force); *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is often too late to take safety precautions.") (cleaned up); *Howard v DeKalb County*, 23-11035, 2024 WL 1174021, at *3 (11th Cir. Mar. 19, 2024) ("the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."); *Est. of Jackson v. City of Rochester*, 705 F. Supp. 779, 784 (W.D.N.Y. 1989) ("The super-cop of television and movies who disarms felons in hand-to-hand combat or with a well-placed shot to the hand should not be the standard by which we determine whether there has been a violation of a citizen's constitutional rights"); *Shepherd*, 920 F.3d at 282 ("there is ample reason to conclude that [the suspect] posed a real threat of serious bodily harm to the officer" even when a knife was by the suspect's side and not raised.) In the moments before the shooting, Lopez-Cabrera's movements and actions were objectively aggressive and would have reasonably caused Trooper Wolensky to be seriously concerned for his safety. He had – within seconds and without

"lunging" – closed the distance between himself and Trooper Wolensky to just five to ten feet. Cases with identical or similar facts have resulted in summary judgment in favor of the officers. *See, e.g., Mitchell v. Schlabach*, 864 F.3d 416, 421–22 (6th Cir. 2017) (affirming grant of summary judgment where the video evidence "makes clear that [an unarmed suspect] intended a confrontation with" the officer when the suspect continued moving towards the officer even as the officer began backing away from him); *Howard*, 2024 WL 1174021, at *4 ("At the time Officer Vance discharged his weapon, Howard was closing the gap between them, knife still in hand, and had managed to get within one-and-a-half parking spaces of Officer Vance. All the while . . . Howard ignored eight commands by Officer Vance -- all some variation of "put the knife down," with the officer's voice sounding more urgent each time -- and even told Vance several times that he would not "put shit down," in a threatening tone.); *Greenwald v. Town of Rocky Hill*, No. 3:09CV211 VLB, 2011 WL 4915165, at *10 (D. Conn. Oct. 17, 2011) ("When [the officer] made the split-second decision to fire two shots at [the suspect], he was confronted with an individual who he reasonably believed was emotionally distressed, . . . was not responding to his or the other Officer's instructions, and was proceeding uphill directly towards him, holding a shotgun with its barrel in his direction"); *Brown v. City of New York*, 192 A.D.3d 963, 966 (2021) (upholding grant of summary judgment on an excessive force claim where "The police officers consistently testified . . . that before the shooting, they had ordered the plaintiff to drop the knife and that instead, the plaintiff had advanced towards them."). Ultimately, as perceived by a reasonable officer, "There is no question that [Lopez-Cabrera] showed no signs of stopping and that [a few] more step[s] would have placed him in a position to attack" Trooper Wolensky. *See Mitchell*, 864 F.3d at 421–22.

The risk of harm to Trooper Wolensky was significantly exacerbated by the circumstances of the officer's retreat. Lopez-Cabrera walked toward Trooper Wolensky while the officer was backing up blindly, on terrain that was rocky, uneven, slippery, and unfamiliar. Moreover, the Trooper had to do so while stepping around several large objects that were sitting in the path of his retreat, including a red dolly cart and a plastic box, either of which could have caused the officer to trip and fall, further exposing himself to the menacing Lopez-Cabrera. Trooper Wolensky had observed that other objects were scattered around the area. It was objectively reasonable for the officer to conclude that he might fall – either by slipping or tripping backwards– if he continued to retreat. *See Fortunati*, 681 F. Supp. 2d at 538 ("[T]he troopers' relative exposure put them at a tactical disadvantage, presumably increasing the danger they faced.").

Certainly, if Lopez-Cabrera had lunged at the Officers, shown them a knife, or explicitly threatened them, it would have made the situation clearer. However, "in excessive force cases the inquiry must be carefully focused on the objective reasonableness of what **did** happen, and not on what might have happened 'with the 20/20 vision of hindsight.'" *Jaquez,* 2016 WL 1060841, at *5 (emphasis in original) (quoting *Graham*, 490 U.S. at 396); *see also Lennon*, 66 F.3d at 421 (2d Cir.1995) ("[W]e are not concerned with the correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene.").

Considering the totality of the circumstances, and in light of the fast-evolving nature of the incident, Trooper Wolensky's decision to use deadly force under the circumstances was objectively reasonable, because he had a report of a serious crime and "probable cause to believe that [Lopez-Cabrera] pose[d] a significant threat of death or serious physical injury to" himself. *Garner*, 471 U.S. at 3. No rational jury could find otherwise. *See Salim*, 93 F.3d at 92.

### C. **Trooper Wolensky Is Entitled to Qualified Immunity**

In the alternative, the court holds that Trooper Wolensky is entitled to summary judgment on the ground of qualified immunity, because his use of force was not objectively unreasonable in light of clearly established law.

"Even if the force is objectively unreasonable, an officer may still be eligible for qualified immunity if it was objectively reasonable for the officer to *believe* that her action did not violate clearly established law." *Keene v. Schneider*, 350 F. App'x 595, 596 (2d Cir. 2009) (emphasis in original) (citing *Salim*, 93 F.3d at 89)). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (alteration in original) (internal quotation marks omitted). "The objective reasonableness test is met if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Salim*, 93 F.3d at 92 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To be clearly established, "a legal principle must have a sufficiently clear foundation in then-existing precedent." *D.C. v. Wesby*, 583 U.S. 48, 49 (2018). The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" *Wesby*, 583 U.S. at 63-65 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)). While there need not be "'a case directly on point,' existing precedent must place the lawfulness of [the officer's action] 'beyond debate.'" *Id*. at 590 (quoting *al–Kidd*, 563 U.S. at 741–42); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.") The focus is on "whether the officer had fair notice that her conduct

30

was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam)).

Here, "Caselaw at the time of the shooting . . . ha[d] not clearly established that it violates the Constitution for a police officer to shoot someone who is behaving erratically, advancing toward the police officer with a knife in his hand, and disregarding a command to get back." *Shepherd*, 920 F.3d at 285. "Indeed, caselaw supports the opposite conclusion." *Id.* (citing to *Kisela*, 584 U.S. at 101-8 (holding that it was not clearly established that an officer's use of deadly force was excessive when used against someone who continued to approach a bystander after ignoring commands to drop a knife, in part because the situation unfolded in "mere seconds")); *see also City of Tahlequah v. Bond*, 595 U.S. 9, 10-12 (2021) (officers "plainly did not violate any clearly established law" in using deadly force on suspect who was intoxicated, would not leave ex-wife's garage, refused to comply with orders to stop moving and to drop a hammer, and then raised the hammer up as if to throw it); *Rose v. City of Utica*, 777 F. App'x 575, 577 (2d Cir. 2019) ("Existing [Second Circuit] case law supports defendants' position that an officer is entitled to use deadly force when an armed individual fails to comply with an order to put down a weapon and moves in what the officer reasonably perceives to be a threatening manner.") (collecting cases); *Est. of Jaquez by Pub. Adm'r of Bronx Cnty. v. City of New York*, 706 F. App'x 709, 714 (2d Cir. 2017) ("Even assuming [the suspect] did not have the knife in his hand when he walked down the hallway, the officers testified that they could not see [the suspect's] hand in that moment and they could not determine that he was unarmed when they deployed the Taser. Thus, in the moments that Jaquez was walking down the hallway 'officers of reasonable competence could disagree' as to whether Jaquez was a threat because the officers knew Jaquez had easy access to a fillet knife,

was acting erratically, and was refusing to obey the officers' commands."); *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 7 (2021).

Of course in many of these cases the officer could see that the suspect was holding a knife or some other weapon. Wolensky could not see what Lopez-Cabrera was holding. But for qualified immunity purposes, that is not a difference that makes a difference. Wolensky had been told by a fellow officer that the subject had a weapon (type not established), and he could see that the subject, who was advancing toward him, was holding something in his pocket and refusing to remove his hand from the pocket. In the circumstances, I cannot say that no reasonable officer would have thought he was be threatened by an armed man.

Plaintiff claims that qualified immunity is inappropriate because, "The key to determining the reasonableness of Defendants' actions depends upon which version of events one credits." (Opp. at 24). But there is no alternative version of events, so there is no dispute about any material fact. The incident was recorded on video; the officers' testimony is corroborated by the video; and no witness has come forward to testify to any alternative version of event.

Plaintiff also argues that Trooper Wolensky's actions violated clearly established law. However, Plaintiff does not cite to any such law. Instead, Plaintiff claims Trooper Wolensky violated the New York State Police Manual (the "NYSP Manual") – specifically Article 16C2(d)(1), which provides that "where feasible and consistent with personal safety, give some warning, other than a warning shot, before using deadly physical force against another person."

There are two problems with Plaintiff's argument. First, the Manual is not "settled law," "controlling authority," or "a robust 'consensus of cases of persuasive authority.'" *See Wesby*, 583 U.S. at 63-65. Second, Trooper Wolensky did not clearly violate any of the NYSP Manual's provisions. In particular, he did not violate Article 16Ca(d)(1) because he did give "some warning

other than a warning shot" before using deadly physical force on Lopez-Cabrera. Plaintiff does not argue that Wolensky's repeated commands to "show your hands" and "stop moving forward" – commands that Lopez-Cabrera not only ignored but announced that he had no intention of obeying – did not qualify as a warning, which need not take any particular form or use any specific words. Nor does he argue that it was "feasible and consistent with personal safety" for the officer to give further warning. To the contrary, for many of the reasons discussed *supra*, it was not "feasible and consistent with personal safety" for Trooper Wolensky to give further warnings before employing deadly force. He had backed up as far as he could safely go; the suspect was ignoring repeated commands to stop; Wolensky had been told by Gorey that the suspect had a "weapon;" and Lopez Cabrera refused to take his hand out of his pocket, where he appeared to be holding a bulging object.

Accordingly, Trooper Wolensky is entitled to qualified immunity, and Plaintiff's excessive force claim against him is dismissed on this alternative ground.

### D. Plaintiff's Claim Against Gorey Is Dismissed

Plaintiff's only claim against Trooper Gorey is for failure to intervene to prevent Wolensky's use of excessive force; Gorey herself did not use any force on Lopez-Cabrera. However, when there is no underlying deprivation of rights, there can be no failure to intervene claim. *See, e.g., Bancroft*, 672 F. Supp.2d at 406. Therefore, because Plaintiff's claims against Wolensky, both federal (Fourth Amendment violation) and state (battery) have been dismissed, so too is the failure to intervene claim. *See James Biggs v. City of New York,* No. 08 CIV. 8123 PGG, 2010 WL 4628360, at *6 (S.D.N.Y. Nov. 16, 2010).

## CONCLUSION

For the reasons discussed above, the Defendants' motion for summary judgment is granted as to all claims and the case is dismissed. The Clerk of Court is respectfully directed to close the open motions at Docket Numbers 31 and 40 and to close this case.

This constitutes the decision and order of the court. It is a written opinion.

Dated: September 6, 2024

_____
U.S.D.J.

BY ECF TO ALL COUNSEL